Number 16-1311 and out, Staffco of Brooklyn, LLC Petitioner v. National Labor Relations Board Mr. Ryder for the Petitioner, Mr. Cantor for the Respondent, Mr. Sleitzer for the Intermediate Mr. Ryder for the Petitioner, Mr. Cantor for the Respondent, Mr. Sleitzer for the Intermediate The board improperly determined that the pension plan continuation policy at the center of this case did not constitute a waiver of the status quo obligation to maintain pension fund contributions after the expiration of the party's final collective bargaining agreement. Second, in the alternative, the board improperly rejected Staffco's alternative waiver argument, namely that the union alternatively waived the status quo obligation by failing to diligently request bargaining after Staffco notified the union that it was not going to continue pension fund contributions past its three-year participation anniversary in the Nisena pension plan. And third, Your Honors, the board's remedy here overreached, and the board ignored the impossibility of performing the remedy. It ignored documentary evidence from the Nisena pension plan stating that it would no longer accept contributions. Did your client make any attempt to make a contribution? Not after the final expiration of the collective bargaining agreement in May 2014, Your Honor, no. If we analogize your impossibility defense to an impossibility defense in a contract action, there that might be an No, it's Staffco's burden to prove its impossibility defense, but the board majority ignored evidence as to the impossibility defense. They didn't ignore anything. That's not fair, is it? They looked at the evidence in this case, and they didn't even discuss it. Staffco's position is it improperly disregarded the weight of compelling evidence as to the impossibility defense. They decided against you, not that they ignored the evidence. Yes, Your Honor. Okay. The principal argument here is waiver. This is a waiver case, and the continuation policy is really at the center of this case. It's undisputed that the parties had to follow the pension plan's rules. You had testimony from the lead program representative, Eric Smith, lead program representative from the union. That's joint appendix page 19. He testified you had to follow the Nisena pension plan rules. Joint appendix page 420, the final page of the party's final CBA extension agreement. It says that the sole and exclusive authority to determine pension benefits rests with the Nisena pension plan. That's in the bargain for document between the employer and the union in this case. They agreed in their final collective bargaining agreement extension that they were going to be completely subordinate to the rules of the Nisena pension plan. And the continuation policy states that upon expiration of a collective bargaining agreement, that staff participation in the pension fund will end unless there's a signed interim agreement or extension agreement. And does your argument depend on participation and obligation being essentially synonymous? Participation in the plan or obligation to fund the employee's pension benefit? In the sense of Cawthorn Trucking and the board's precedent, yes. But in the sense of the definitions, no, Your Honor. It's a distinction without a difference, really. Because here, unlike some of the other waiver and non-waiver cases that are cited by both parties, we really have two bodies of case law, right? We have Cawthorn Trucking and Oak Harbor Freight Lines, the waiver cases on one hand. And then we have a body of non-waiver cases, Schmidt-Tiago, KBMS, General Tire and Rubber. And in none of those non-waiver cases that the board so heavily relies upon, in none of those cases do they talk about upon the expiration of a collective bargaining agreement. Whereas in our case, and really like Cawthorn Trucking, they talk about what happens upon the expiration of a collective bargaining agreement. And, yes, as Your Honor points out, the board is trying to hang its hat on the use of the word participation in this case instead of the use of the word obligation. But we can look to the parties' past practices here, and especially the very telling admissions from the union's lead negotiator. You have Michelle Green, the union's lead. Well, I'm not sure how far I would go down that road. I mean, you want belt and suspenders if you're representing employees. And, you know, life is simpler for them if they say, you know, let's keep this up, nothing will change. I don't know. So I think, I mean, I think stronger for you is Cawthorn and Oak Harbor and, you know, the language there that's quite closely analogous to the language here. Is there anything that we should be cognizant of differentiating fund and plan for people not as steeped as all of you are in this area, the fine distinctions of participation in obligation, of fund and plan, may carry more weight than are apparent to us? Yes, Your Honor. To address your last point, there is the Nisena Pension Fund, which is the actual entity in which contributions are deposited. And then there's the Nisena Pension Plan, which is the entity that creates the rules and is the ‑‑ that's the entity on which the letterhead is stated, for example. The warning notice when all parties were warned that Staff Co. was terminated as a contributing employer, that was on Nisena Pension Plan letterhead. But to address Your Honor's comment about belts and suspenders, you know, that's an argument that's made by the union and the board. And very significantly in that portion of the brief, page 24 of the board brief, for example, they call it the path of least resistance, not belts and suspenders. There's not one citation to the record in that part of their brief. They can't cite any testimony or any documentary evidence that that was the real reason that they executed five interim or extension agreements in less than a two‑year period. The evidence that we have is Michelle Green's testimony where she stated, when she was asked point blank, why did you execute so many of these agreements, why didn't you rely on the status quo obligation? She said to make sure pension fund contributions would continue. Maybe one of the most important documents in this case is Michelle Green's October 12, 2012, email. That's Joint Appendix, page 107. That's the cover email that she sent to the union's lead negotiator, Mr. Brian Clark. That was the first time they signed one of these extension agreements. And she said to Brian Clark, quote, hello, Brian, we need to send the signed interim agreement back to the fund. See attachment. To continue the pension benefit in the event we do not reach an agreement. End quote. She didn't say to continue SNAFCO's participation. She said to continue the pension benefit. Now you're really giving the lawyerly, you know, expecting in an email some sort of lawyerly, you know, care with words and terms that I think goes beyond what we should do on review in a case like this, aren't you, at this point? Well, respectfully, no, Your Honor, because it's the board and the union that are arguing about the significance of the words. And it's not as if this was some low‑level employee. This was the lead negotiator for the union. And she was the one who negotiated and drafted the extension agreement. So it's some of the best evidence we have about the true intent of the parties here, which is at the center of this case. But there is a very ‑‑ My other question is, I mean, you talk about there's no reference to the record, et cetera, and that the plan should control. But if you look at language in the plan, like at what's JA 187, it's a definition of employer at section 2.05. The plan distinguishes between the obligation of an employer to make contributions to the pension plan and when an employer ceases to be an employer for the purposes of the trust policy and the employer's obligations to make distributions. So I'm not sure that I guess the record is so clear cut that your obligation to make contributions is synonymous with when you ‑‑ the distinction that you're seeking to make here, I'm not sure that it's borne out by even the way that the plan describes the employer's obligations. That section is defining an employer under the plan, whereas the policy for the continuation of pension fund coverage upon the expiration of the collective bargaining agreement, that's speaking directly to what happens to the employer's participation in the pension plan upon the expiration of a CBA without an interim or extension. But I guess my point is that the board, in its decision, said that we can distinguish between your obligation to make contributions to a plan and the termination of the collective bargaining agreement or the expiration of the collective bargaining agreement for similar rationales, and that's key to this case that you're asking us to reject that reasoning by the board, right? Yes, Your Honor, Stafco is asking this court to reject that reasoning, to the employees, right? So you could stop participating in the plan, but still have obligations to the employees. Not under this collective bargaining agreement. Remember, this is a status quo case that extends the obligations in the collective bargaining agreement. This collective bargaining agreement said pension benefits had to be through the NISNA pension plan. It couldn't be through another plan. That was what the parties agreed in their collective bargaining agreement. That's Joint Appendix 420, especially. It said that the NISNA pension plan had sole and exclusive authority to determine the benefits for plan participants and to make changes thereto, which would include the pension plan rules. That's when they're the provider, but if they went out of business, presumably that would fall away, and yet the employer's obligation would continue. I mean, if they went out of business, you wouldn't think, well, you know, when Aetna starts providing a plan that NISNA is the sole determinant of its terms, right? Yes, Your Honor, but this collective bargaining agreement does not say pension fund contributions in a general matter to union members. It says pension contributions through the NISNA pension plan. That's specifically what the parties agreed here, no more, no less. And I guess that's why I was asking the question, because I was probing, you know, surely that doesn't mean the selection of this plan doesn't mean that if this plan were defunct that the obligation would cease, and I think your answer to that has to be right. It wouldn't, you know, it's not their bad luck, you know, and the employer's good luck that this obligation evaporates. Well, no, at that point, and that actually segues into the alternative waiver argument, at that point the onus is on the union to demand bargaining over the effects of the failure in this hypothetical of the NISNA pension plan, and that's exactly what did not happen here. There's unrebutted testimony from Mr. Clark, the lead negotiator for the employer, that he put the union on notice that Stafco wasn't going to go beyond the May 2014, the three-year participation anniversary, and that they were going to discontinue pension fund contributions. And at that point, the burden was on the union to demand bargaining, or otherwise it would waive the status quo obligation. That's an alternative waiver argument that the board majority never really considered with any in-depth analysis. But the board essentially found that the May 20th meeting resulted in a request for bargaining by the union. Didn't the board make that finding? Right, and that is a strong departure from board precedent, from this court's precedent, and from circuit court precedent around the country. There's two types of bargaining demands. There's an explicit bargaining demand and an implicit bargaining demand. The board, it appears from its brief, knows better than to claim explicit bargaining demand here because there was no express words that said, we hereby demand bargaining on post-contract pension fund contributions. Instead, the board is arguing an implicit bargaining demand was made. And this court and board precedent has held that when it's an implicit bargaining demand situation, there needs to be some indicia that shows a desire to bargain. There needs to be a suggested meeting place, a suggested meeting time, proposed bargaining topics, and a proposed method for reply. I see that my time is up, but if I may answer Judge Wilkins' question. They're 0 for 4 on all of those factors in this case. They don't have one of them, let alone any of them, for the court's consideration. And all that undisputably happened. Because my client has a different version of events, but even if you accept the union's version of events at what happened to that May 20th meeting, Eric Smith said to Stafco, continue pension contributions, sign another agreement. That's very supportive of Stafco's petition for review for two reasons. One, by virtue of the fact that he's demanding they sign another agreement, that supports the first waiver argument that there was waiver under the policy for continuation of coverage. But two, all he's doing there is, at most, protesting. He's objecting to Stafco's notice that it was going to discontinue pension contributions. This court and the board's own precedent has held that's not enough. I know Stafco's, I'm forgetting his title, but he says, well, look, have Ms. Green or have somebody contact, who is it, Mr. Clark? Yes, Your Honor. Who is the negotiator for Stafco, right? Yes, Your Honor. And there's testimony in the record from Ms. Green, who's the negotiator for the union, that after that May 20th meeting, that she and Clark had several conversations about all of this, in that time period between May the 20th and, I guess, July the 28th, or whenever the 60-day period was up, right? No, Your Honor. There's no record evidence that Michelle Green ever contacted Brian Clark. Brian Clark offered unrebutted testimony that no one from the union ever contacted him. And it's very significant that the administrative law judge in this case found that from May 22nd to July 31, there was no bargaining demand from the union in this case. So I'm going to look at JA 516, left column, second full paragraph. Yes, Your Honor. The last sentence of that second full paragraph. Nevertheless, Green stated that she continued to ask Clark for the respondent to resume its contributions to the pension fund as late as July 28th because the pension fund provided the 60-day grace period, et cetera. And it's talking about there what she did after May 22nd. So isn't that evidence that here this is part of the ALJ's opinion? Not for a demand for bargaining, Your Honor. And in the same page, if Your Honor scrolls down two more paragraphs, the first sentence of that paragraph, as testified by Smith, Green confirmed that the union did not request to bargain with SAFCO between May 22 and July 31. The board and the union in this case have not taken an exception from that finding of fact. I saw that, and that seemed to be very problematic. And it also seems to kind of contradict, though, what the ALJ and the board concluded, ultimately conclude in this case where they say that there was no failure to bargain or no waiver by the union. So I didn't know whether that meant that there was no written request to bargain, as is said in the very next sentence, and that's what they're saying. If I may, Your Honor, you're touching upon one of the most important issues in this case, and that is the very subtle but very material and well-established distinction between merely protesting an employer's proposed action and actually making a demand for bargaining. This court in Prime Service Inc. v. NLRB and the board itself in Citizens National Bank of Wilmar, they've both held that merely protesting an employer's action, demanding that the employer reverse that action, that's not enough for the union to satisfy its affirmative obligation to demand bargaining. And that is an alternative ground for waiver. And this inconsistency that Your Honor is pointing out, that's just yet another reason for review, to grant the petition for review in this case. The board majority gave the union a complete pass on its failure to demand bargaining. And the board is now trying to say that this May 20th meeting was somehow an implicit bargaining demand. At most, all Mr. Smith did was object to the employer's proposed action at that time. This court and the board's precedent has held that's not enough. And that is another reason why the petition for review should be granted. Thank you. We'll give you a couple minutes rebuttal after hearing from your opponents. Thank you, Your Honor. May it please the Court, Jarrett Cantor on behalf of the National Labor Relations Board. Your Honor, as Staff Co. just mentioned in its opening part of the argument, that this case is being litigated in front of the Court on its affirmative defenses. And obviously it did bear the burden on all of them. You know, there certainly is no contesting that there was a statutory obligation, that then they ceased to honor it, and that there was no bargaining. So the elements of the violation of 8A.5 are there. The question, then, just is whether they met the affirmative defenses that they are urging. And respectfully, the board submits that they did not. Turning Judge Wilkins just to the end of the opening part of the argument, I think what the part of the DNO that you're citing there is talking about is that there were no written that, as you pointed out, the next sentence there talks about a written. And July 31st is when the union submitted a bargaining demand to renegotiate the entire expired contract. Because one element that kind of is not as heavily discussed in the brief, but comes through in the decision and order, is that a lot of what was going on here was being driven by the fact of, oh, we're not going to have any more employees. Oh, now we are. The state court litigation kept postponing the potential closure of this facility. So once it became clear that it was not going to close on May 22nd, and then we finally, by July, the union made the decision to submit a full written bargaining demand, and part of that was a request for information to renegotiate the contract, because at that point, I guess it became clear to at least the union that SNAFCO was going to continue to have employees into the future. But here's the problem. I mean, if we're going to say that the board obviously knows the difference between a written request and an unwritten request, and they use the word written request in the subsequent sentence, then how are we supposed to read the first sentence of the paragraph that says that the union did not request a bargain with SNAFCO between May 22nd and July 31st? Your Honor, I think that what she was testifying to there was a question of they had not made a request to bargain about the entire contract. Not about this particular continuation of pension fund contributions. Correct, correct. That, I believe, is what she is testifying to there, and certainly reading her in testimony entirely in the rest of the decision here allays, I think, any concern that maybe that might have been inartfully stated, that certainly when you read those two sentences, July 31st is talking about the demand to negotiate an entire new successor agreement, which the parties had been presumably holding off on doing because it seemed like SNAFCO would have no employees who would move the question. Then on July 31st, when it becomes clear that SNAFCO is at least going to have these four employees, maybe not indefinitely, but into the future, the union then requested negotiations for an entire new successor agreement, and I believe including on this issue about pension contributions. So I don't, certainly do not read that, as company would urge, that that is the board there saying in contravention to the other parts of the decision in the analysis that there, in fact, had been a demand on May 20th, and then certainly there's the follow-up on July 9th. So the board and the ALJ both seem to find that there was a demand or request for bargaining at that May 20th meeting. Yes, Your Honor. The friend on the other side says that that's essentially an erroneous finding based on board precedent and our precedent. What's your response to that? I think as we lay out in our brief, Your Honor, respectfully, the board very strongly disagrees that as we lay out on the brief, there's no requirement that a demand for bargaining be made in writing. An oral one is fine. You look at the context in which it was made. You see if the other side understood what was being asked of them. You look at the cases where you're talking about protest or just complaining, and here you have, and again, this was, at this point, a routine. The parties understood what was going on. This was the fifth, sixth time. Can you boil it down to one sentence that says what the demand for bargaining was, the evidence was upon which there could be such a finding? From Smith? From the record. July 9th or the other day, either one. What's the best evidence you've got that there was a demand for bargaining? The demand for bargaining would be, based on the fact that would be, it's two parties. Are you having a hard time boiling it down to one sentence? No, Your Honor. It's stay current. Stay current on the contributions. So the notice is we're not going to sign another agreement. It's stay current and sign another extension. So you not only have a demand, stay current here. Is that a demand for bargaining, or is that a complaint about you're not doing what you ought to be doing? Well, Your Honor, this might be a different case if it was don't stop paying, and that was about it. But here we have stay current, which the parties, everyone understood what that meant. Certainly there's no contesting that that was not understood. And then we actually have a proposal, and certainly this is not a case of an initial, a newly certified union where they communicate to an employer, you know, hundreds of terms they want to talk about. Here the issue that the demand goes to what the notice was, and it was we're not going to sign another one of these. So the demand is stay current, keep making the pension contributions, honor the status quo, and you in fact have a little bit, you have the icing on the cake, which is an actual proposal. Sign another extension or interim agreement. And, you know, and at that point some of their other arguments kind of go to an issue that they're just not talking about, which is then whether there was good faith bargaining. Their affirmative defense is just there was no demand. And they talk about explicit or implicit, and the board here, the question really is, is there a qualified or is there a demand, is what was said qualify as a bargaining demand? And certainly he did not say I hereby demand that you bargain with us. And I don't think the act in board law certainly requires something that detailed. And counsel talks about prime services, but there the court says in all the things he cited, such as those type of things. And the board was not, the court in prime services I don't think was limiting it to, it has to be these are the type of things that count as addition. And does it make a difference in terms of the reasonableness of the ALJ's reading of the facts here that this is not, you know, the UAW at the height of General Motors function with thousands and thousands of employees. We're talking about maybe a relatively informal situation with four employees being covered for half a year. It's a relatively small situation with people who have dealt with one another quite a bit. Does that make any difference? I don't think so. I mean certainly after, so this May 20th meeting was about the big layoff that was going to be coming. My recollection of the record is 39 employees continued on for several more weeks or months. And then we get to the point where I would leave it to intervene or to I guess speak about extra record evidence. But it continued up and through the decision and order. It still had these four people working at these school-based, so it still has four employees and it might have them until today. So you basically have four employees in certainly a small unit, but it's not a unit of one, so it still qualifies, who have been working without their pension at this point. And so I don't think it makes a difference. And certainly there were. And they had a new agreement? I thought they had a new agreement as of December, so it picks back up. As of December of? The same year, 2014. I'm sorry, maybe this is better for intervening. It might be better in terms of where the parties are now. So back on your sweet spot, can you help me distinguish Oak Harbor? Right. How this case is not Oak Harbor? Yeah. Well, I think, so Oak Harbor, I want to make sure I have the language in front of me. Oak Harbor talks about, and the language there is that, upon the expiration of the CBA, which required contributions, the employer, in that case, agreed to contribute them until such time as it notified the union, in writing, with a copy of its trust, of its intent to cancel such obligation. So there we have language in either the pension agreements or trust, whatever the operative document there was called. I think it was a trust subscription agreement. A trust subscription agreement, yes. So there we have, as the board found, something that clearly and unmistakably indicated to the parties that, in that case, provided it gave the notice and complied with that, that an employer could cancel such obligation. And what is the obligation referring to? It's referring to its bargaining agreement, post-expiration bargaining agreement, obligation to provide pension contributions in that case. And I think, as this court recognized in enforcing the board's decision, in that case, against the union's petition, that when you're looking at this language, to see if it satisfies this Cawthorn test of clear and unmistakable waiver, you're looking for language that talks about the employer being authorized to essentially act unilaterally with regards to the status quo, post-expiration. And is that language allowing the employer to act unilaterally with regards to changing that status quo, to alter it in some way? And respectfully, the language that we have in this case is not Oak Harbor. It is not Cawthorn, despite the protestations of counsel. And I think... And is that because it doesn't say that it may cancel? I mean, the difference, because it actually feels somewhat parallel, as Staff Co. argues, in this case, the employer's participation in and status as an employer under the fund shall forthwith terminate. The service of such employers and employees shall no longer be credited under the plan. Then there's a written notification that the employer is no longer maintaining the plan and that the covered employment of the employees terminated. And so I take it from what you just said that I had thought that you were hanging your hat on the difference between participation and obligation, but it sounds like you are hanging your hat on the affording of the employer of an ability unilaterally to express an intent to cancel? No, no. I mean, certainly if you're trying to do a chart of which cases fall on which side, often the language that the board law looks to is the language that the party is urging satisfies clear and unmistakable. Does it talk about the employer's obligation or duty to whatever the issue is? And does that language talk about them being able to act unilaterally with regards to it? The language here does not talk about the employer being able to do anything. This language in the continuation policy talks about what the trust is going to do to the employer, but it doesn't talk about... I mean, certainly we could tinker with this language a million different ways to hypothetically get it over the hump by inserting, you know, deleting sentences, but respectfully it's the board found, and I think reasonably, that it is not Cawthorn, it is not Oak Harbor, and maybe it's one shade of gray away from all the cases that they say are completely distinguishable. I guess I'm asking you to zoom into a little bit of a lower level of specificity and say where you see, and I know we're in a deferential... Well, actually we're not, we're in a de novo review. Correct, on the contract. So zoom in and say what it is you think that distinguishes this, because unlike in Oak Harbor, in Cawthorn, there wasn't a discussion of the employer's ability unilaterally to express its intent to cancel. It just talked about the obligation shall terminate, and here it's participation that terminates. And I'm just, again, I'm just trying to, and I realize there's many variations out there, but here we have a couple, and we pretty recently decided in Oak Harbor that something that sounds an awful lot like this was a termination, and so help me out. Well, yes, Your Honor. Again, what I would come back to is that, although not necessarily requiring the word obligation, but maybe in a logic class you could make that inferential leap, and under some other standard judging, you know, does this language indicate something? But when we're talking about is it clear and unmistakable without talking about the employer's obligation and where is that obligation deriving from? It's deriving from the collective bargaining agreement, and because that's expired, it's deriving from statutory laws and obligation, that it's certainly, there's no question that this language isn't unclear, but it's clear to an entirely separate question, which is what will the pension plan do to this employer? But if the CBA requires funding through this pension plan, isn't that the same thing? How can you divorce what the pension plan will do from what the obligation or participation is after the CBA's expired? Well, it's only divorced in the sense, Your Honor, that the status quo was a pension benefit and the company contributing to this pension plan. A particular pension benefit through a particular trust. Yes, it was named in the... It's specified in the CBA. Yes, it was named in the CBA, and then they certainly... Then why isn't it extremely relevant what the plan will do in the event of the expiration of the CBA? I mean, it certainly is relevant, but whether that language is a clear and unmistakable waiver of the union's right to bargain about the employer acting, you know, acting once it stopped signing these things. You know, what was the union obligated or what was the union right at that point? And that was for the company to come to them and to bargain about what would happen next if they weren't going to maintain the status quo. I see I'm very far over my time, Your Honors. Unless there are any further questions, the Board respectfully requests enforcement. Good morning, Your Honors. Richard Seltzer of Cone, Weiss & Simon for Intervenor, New York State Nurses Association, known as NISNA in parlance. And I'd like to pick up just where the court and counsel for the NLRB ended. I think the distinction between Cawthorne, Oak Harbor, and here is one is the language addresses the right of the employer. And in the other here, the language addresses the right of a third party. And that is what the board and the courts have distinguished. In fact, this court's own decision in Oak Harbor stated in reviewing what the board's case law in this area was, stated they will find a waiver only, and that's this court's phrase, only when there's explicit contract language authorizing an employer to cancel its obligations. And that's at 855 at FedSec 3rd at 441 to 442. So the way this own court has described the board's case law requires that the language go to the employer's obligation rather than to a third party's rights. And following up questions that Judge Pillard asked earlier, and I think that go to this issue and the possibility issue and a number of other issues, the board has considered situations where the language of the contract states the contributions will go to Fund A. And for various reasons, Fund A will not take the contributions. The union changed. The employer only wants to give the old rate of contributions, and the fund will not take the new rate. In those cases, Christopher Street Owners cited in our brief and Clear Pine Molding cited in our brief, the court, the board did not hold, throw up its hands and say, oh, well, the language says it will go to that fund. So the employer gets to keep the money, and the employees here, the nurses, get no benefit from the part of the contract that was devoted to pension benefits. In each of those, it said they had to give notice, they had to bargain with the union, and there might be alternative ways of providing the benefits, even though the contract language talked about one fund. So I think this is actually very helpful in the sense that, yes, in the absence of any further action, the term of the bargaining agreement here terminates the employer's participation in the fund, the employee's service is not going to be credited to the plan, the employer is not going to maintain the plan, but that is not the same as saying, and actually this is off the table as a matter for future bargaining. The employer is home free, doesn't have to do anything. So without bargaining on it, yeah, the thing dies on the vine. But the question is whether it's gone that one step further that the board found and we affirmed in Oak Harbor to the point of saying, and this is off limits as a subject. Correct, Your Honor, and I think the board's case law and the cases I just cited about the change of the fund reflects that it's not off the board. I want to address very quickly one or two of the other points raised by counsel beforehand in the court. Stafco makes it sound like at the May 20th meeting was an offhand comment at the water cooler to the Stafco's director of technology, saying, yeah, you know, we really don't like the fact that you're doing such and such. That's not what happened here, and Judge Pillard, I do think the course of dealings between the parties is relevant and actually it supports the board's decision. These parties for a year had been dealing with uncertainty, and the way they dealt with that is the union would say, we want you to stay current, we want you to sign an agreement, and the company would do it. That's exactly what they did on May 20th. That's exactly what they did on July 9th. They didn't say, we don't like this. They said, we want you to sign this agreement. And Stafco knew exactly what was being said because that's what they had been doing for over a year and a half. And I might say, in one of the cases we cited, Imperial House Condominiums, 279 NLRB 1225, a union requested that instead of contributing, we keep getting back to this, instead of contributing to Plan A, we'd like you to contribute to Plan B. And the board concluded that was a proposal, but that was a request to bargain because it was a bargaining proposal. And giving the other side a bargaining proposal is a request to bargain. In the Indian River case, which we also cite, 340 NLRB 467, the employer said, we're going to do such and such, and the union said, that's a mandatory subject of bargaining. And the board said, that's enough. You don't have to say, we want to bargain because it is. Saying it's a mandatory subject, that's the way parties communicate in the real labor relations area. And that's exactly what happened here. I don't want to go too far beyond the record, but has anybody ever said impasse in this? No. And that's frankly another reason why the union wanting these agreements was, there was a reason for that. Because if you have an agreement, it eliminates the question of impasse. Staff go at times below, raise the question of impasse, and then withdrew the question of impasse. And as I'm sure your honor knows, it's a difficult area, impasse. And if you have a written agreement and a written extension, it eliminates any confusion about that. And finally, I think, Judge Santel, your comment about, your question about, did the company attempt to make the contribution, was a telling question. And the answer is no. The company didn't want these contributions. I mean, I understand why. They didn't want the contributions accepted, so they didn't want to make the contribution. And let me just point out four factors that go into why it's not clear how the fund would react to these circumstances. And of course, Staff Go did not call any representative of the fund at the hearing. So there's no evidence, and it's their burden. The first contract extension agreement, which is at the record at 383, was reached 90 days after expiration of the prior agreement. Not supposed to happen. You're only supposed to have a 60-day cure period. It happened. There's no explanation in the record, but that's what happened with the first agreement, which might have led Ms. Green and Mr. Smith to conclude they weren't so sure that the fund would not accept these contributions. And one last thing I'll say about the fund. Like many institutions, they have rules, but they welcome repentant sinners. And that's exactly what this fund did by having a provision, and there aren't even particular requirements for it to be readmitted. Section 2.03 of the policy, which is at the record at 188, says an employer whose status as an employer has been terminated may be admitted as an employer according to such terms and conditions as the trustees decide. No one knows whether the contributions would have been accepted or not, because the contributions were not offered. We would urge the Court to enforce the Board's decision. Thank you. Thank you. Mr. Reiter, we said we'd give you a couple of minutes of rebuttal, even though we used up all your time with lots of questions. Thank you, Your Honor. If I may just briefly to Judge Wilkin's point about JA 516 and part of the ALJ's decision that said Michelle Green contacted Brian Clark over ten times. If you look to the citation in the administrative law judge's sentence there on JA 516, he's citing page 80 of the transcript, which is on Joint Appendix page 35. If you look to line 18 on that page, Michelle Green gave that testimony in response to a question about what the parties did after the very first CBA expired in 2012. That is when she said they spoke approximately ten times, that she and Mr. Clark spoke approximately ten times. She's talking about things that happened before the expiration of the final collective bargaining agreement in 2014. She's not referring to a supposed ten times that she and Mr. Clark talked over the summer of 2014 when the final CBA expired, and neither the board nor the union have taken that position as a factual matter in their briefs. Secondly, the employer in Cawthorn Trucking did not have a right to unilaterally cancel post-contract pension benefits, yet the board still found a waiver in that case. Oak Harbor doesn't really speak one way or the other. It's kind of an opposite to this case. Cawthorn Trucking, though, is very relevant, and like the language in Cawthorn Trucking, the language in this case speaks to what happens upon the expiration of the CBA, but it can't be read in isolation because the bargained for document here, the collective bargaining agreement, says that you have to make contributions into the NISNA pension plan and that the NISNA pension plan is the last authority on all things pension-related. The parties said we are going to follow the NISNA pension plan rules. That is in their contract, and the significance of that cannot be overstated. And finally, Your Honors, remember this is a failure to bargain case. That's the allegation here, and when there was finally an actual demand made, because the board and the union skip over that. They really skip over how it was on the union, as a matter of law, to make their bargaining demand known. And on July 31st, when there was finally a bargaining demand made, my client, Stafco, showed up at the table. They said, sure, you want information? Here's the response to your request for information. You want to bargain? Sure, let's show up and bargain. And they made a good faith offer for an alternative retirement benefit, a 403B plan. It's in the record. It was rejected out of hand. The union never made any type of counteroffer. It just repeated its demand that pension fund contributions resume in the NISNA pension plan. But the parties were able to reach an agreement on health benefits. This is a failure to bargain case, and Stafco bargained when a demand was actually made. So forgive me. I should probably know this, but the ongoing status of the pension benefits of these employees is governed by the board's decision here. They don't have a new superseding term for pension? No new superseding term in the collective bargaining agreement? No, there's no pension benefit at the moment. There's no CBA at the moment. Correct. The last discussion about pension benefits was Stafco's or about retirement benefits, I should say, which is related, of course, was Stafco's offer to create a defined contribution plan under 403B, and that was rejected out of hand. Again, when there was a bargaining demand finally made, Stafco showed up. That's the alleged violation here of Section 8A.5 and 1, and for that reason and all the reasons stated, we respectfully request that this court grant the petition for reveal. Thank you, Your Honors. Thank you very much.
judges: Pillard, Wilkins, Sentelle